UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
RAMON PEGUERO,
                                    :
                Petitioner,         :        REPORT & RECOMMENDATION
                                    :
          -against-                 :        14 cv. 6128 (RA)(MHD)
                                    :
JOSEPH T. SMITH,                    :
                                    :
                Respondent.         :
------------------------------x

TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.:


     Petitioner Ramon Peguero[1] seeks a writ of habeas corpus to
challenge his 2007 conviction in the New York State Supreme Court,
New York County, on two counts of murder in the second degree,
single counts of attempted murder in the second degree, conspiracy
in the second degree and burglary in the first degree, and three
counts each of criminal possession of a weapon in the second and
third degrees. The court sentenced Peguero to an aggregate prison
term of 50 years to life.


     By his petition, Peguero asserts five sets of claims. He
argues (1) that his convictions were against the weight of the
evidence, (2) that he was denied a fair trial because the trial

---

[1] In papers filed in state court petitioner's name is listed
as Pequero. In his habeas petition he spells his name Peguero. We
follow the state-court practice here.

1

court refused to give a justification charge with respect to one of the murder counts, (3) that his right to counsel under the Sixth Amendment and Massiah v. United States, 377 U.S. 201 (1964), was violated by the admission into evidence of testimony by two of his fellow prisoners, (4) that the court denied him a fair trial by vigorously interrogating the jury foreperson, who had beeen improperly investigated by the State, and then declining to remove her from the jury, and (5) that he was denied his Sixth Amendment right to effective representation by his trial counsel as a result of a series of purported shortcomings in his attorney's performance before and during trial.

Respondent resists, and in doing so he argues first that the petition is untimely under the Anti-terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244(d). Respondent next asserts that the weight-of-the-evidence claim is not cognizable on habeas review, and that a number of petitioner's claims -- notably, most of his challenges to the weight of the evidence, his complaint about the failure to discharge the foreperson, and one version of his ineffective-assistance claim[2] -- are unexhausted and procedurally

---

[2] The assertedly unexhausted claim of ineffective assistance concerns counsel's alleged failure properly to investigate the case.

barred. He further asserts that Pequero's <u>Massiah</u> claim is procedurally barred. Finally, respondent argues that all of the claims -- including Peguero's weight-of-the-evidence claim if deemed an evidentiary-insufficiency argument -- are meritless.

For the reasons that follow, we conclude that the petition is untimely and that in any event all of Pequero's claims are either procedurally barred or meritless or both. We therefore recommend that the writ be denied and the petition dismissed.

I. <u>Prior Proceedings</u>

Petitioner's convictions stemmed from his participation in a drug-trafficking organization that operated in the vicinity of the Frederick Douglass housing project omn the upper Westside in Manhattan. The gang engaged in street-level sales of crack cocaine, and some of the participants in the group -- including Pequero -- also committed acts of violence, including several murders, during the period from 1999 to 2005. These activities led to a police undercover investigation, on the basis of which a grand jury returned a 32-count indictment on March 13, 2006 charging 18 defendants, including petitioner, with various crimes related to the distribution of narcotics. (Resp. Ex. JJ).

As many as ten of the named defendants pled guilty to a variety of charges. (Resp. Ex. E at 4 n.2). Five of the remaining defendants were tried together, including petitioner. These defendants included Al Javier and Tony Council, described in the indictment as co-leaders of the organization; Michael Wilson; and Tyrone Council. The indictment identified Pequero as the "enforcer" of the organization. (Resp. Ex. JJ at second-third pages).

The indictment charged all defendants with second-degree conspiracy to distribute narcotics, and named petitioner as involved in numerous overt acts, including cocaine distribution and two fatal shootings. (Id. at third, fifth & seventh pages). It also charged Pequero with multiple counts of murder in connection with the deaths of two individuals (Tyrelle Williams and Al Cruz)[3], a single count of attempted murder, multiple counts of burglary, a count of attempted assault, and three counts of weapon possession. (Id. at second-nineteenth counts).

Prior to trial, petitioner's attorney filed an omnibus motion

---

[3] One of the counts, invoking the shooting death of Tyrelle Williams, charged first-degree murder based on the premise that the killing had been intentional. (Tr. 3818-21). In connection with that charge, the jury was also given a lesser-included charge of second-degree murder (felony murder) for that homicide. (Tr. 3821-24).

dated June 29, 2006. As part of that motion, he sought severance of Peqero's case or severance of the homicide charges. The judge denied severance on August 15, 2006. (Resp. Ex. I at 6).

Trial commenced on November 6, 2006. On December 18, 2006 the jury convicted Tony Council of conspiracy and two counts of drug distribution. (Tr. 3971-72). At the same time the jury convicted Javier on seven counts of criminal sale and on the conspiracy count, and convicted Tyrone Council and Michael Wilson of conspiracy. (Tr. 3969-71, 3972-76). One day later, the jury convicted Pequero of two counts of second-degree murder, one count of attempted second-degree murder, one count of first-degree burglary, one count of second-degree conspiracy, three counts of second-degree criminal possession of a weapon, and three counts of third-degree weapon possession. (Tr. 3993-97).[4]

On January 16, 2007, Pequero's counsel moved, pursuant to Crim. Proc. L. § 330.30 to set aside the verdict, arguing that the prosecutor had improperly investigated the foreperson, and that the trial court had repeatedly quizzed her, thus intimidating her into agreeing to guilty verdicts. Counsel also challenged the sufficiency

_____

[4] The jury acquitted Pequero of the one count of first-degree murder. (Tr. 3993).

of the evidence with respect to one of the murder counts (concerning the death of Tyrelle Williams) and the related burglary count, as well as with respect to two of the weapon-possession counts. (Resp. Ex. A). Pequero himself filed a pro se motion on January 25, 2007, repeating some of his attorney's arguments about evidentiary insufficiency and also asserting inter alia that the foreperson should have been disqualified since she may have had personal knowledge of the facts. (Resp. Ex. B). On February 1, 2007 Justice Wittner denied the motions and sentenced Pequero to an aggregate term of 50 years to life. (See Resp. Answer ¶ 6[5]).[6]

Petitioner filed an appeal to the First Department from his conviction. He pressed three arguments. First, he complained that

_____

[5] The court imposed concurrent terms of 8 1/3 to 25 years for conspiracy and, with regard to the Williams murder, concurrent terms of 25 years to life for the felony murder, 15 years for burglary and second-degree weapon possession and 7 years for third-degree weapon possession. Consecutive to those sentences, Pequero received concurrent terms of 25 years to life for the Cruz murder, 15 years for second-degree weapon possession and 7 years for third-degree weapon possession.  In connection with another gunplay incident -- a shootout on Christmas eve 2003 -- he received concurrent terms of 15 years for attempted murder and for second-degree weapon possession, and 7 years for third-degree weapon possession.

[6] As for petitioner's co-defendants, Javier was sentenced to 40 years to life; Council received an aggregate term of 30 years to life; Wilson was given a term of seven to 21 years; and Tyrone Council was sentenced to six to twelve years. (Resp. Ex. E at 4 n.2).

the trial court should have offered the jury an instruction on his justification defense with respect to the Williams murder. (Resp. Ex. D at 16-21; Resp. Ex. F at4-7). Second, he asserted that there was insufficient evidence to sustain the burglary conviction -- which involved the death of Williams on August 6, 2001 -- and the related felony-murder conviction. He argued that the evidence failed to prove that, when he entered the building where the murder took place, he had intended to commit a crime there, and that this weakness in proof barred his conviction both for burglary and for felony murder. (Resp. Ex. D at 21-28; Resp. Ex. F at 4-7). Third, he insisted that, in violation of Massiah, his right to counsel had been violated by the admission of testimony about statements that he had made to two fellow prisoners -- Isaac Scott and Francois Beauchamp. (Resp. Ex. D at 29-38; Resp. Ex. F at 7-11). He further asserted that the failure of his trial lawyer to make this Massiah argument had denied him the effective representation of counsel. (Resp. Ex. D at 38-40).

On March 24, 2009 the Appellate Division affirmed the conviction. People v. Pequero, 60 A.D.3d 542, 877 N.Y.S.2d 230 (1st Dep't 2009). The panel rejected the evidentiary challenge to the burglary and murder convictions related to the death of Williams, noting that the evidence reflected that Pequero and two other "drug

dealers" had entered the building with guns in their hand, which suffced to permit a finding that he had intended to commit a crime in that structure. Id. at 543, 877 N.Y.S.2d at 231. As for the trial judge's denial of the justification-defense instruction, the court observed that there was no evidentiary basis to support such a defense since Pequero was plainly the aggressor when he entered the building and Williams had manifested no threat to him that would have justified deadly force. Id. The panel also rejected the Massiah argument and the related ineffective-assistance claim because there was no evidence that at the time that Pequero made his inculpatory statements, Scott and Beauchamp were acting as agents of the State. Id. at 543-44, 877 N.Y.S.2d at 231.

Petitioner sought leave to appeal from this decision to the New York Court of Appeals. (Resp. Ex. G). That court denied his application on June 10, 2009. People v. Pequero, 12 N.Y.3d 919, 884 N.Y.S.2d 700 (2009).

Nearly 14 months later, by motion dated August 5, 2010, petitioner moved pro se to vacate the judgment based on numerous purported inadequacies in the performance of his trial attorney, including a failure adequately to investigate the case. (Resp. Ex. I). On March 16, 2011 Justice Wittner denied the motion. (Resp. Ex.

K).

On or about March 18, 2011 petitioner filed a reply affirmation in support of his 440.10 motion. (Resp. Ex. Q). Justice Wittner deemed this document to be a motion to renew, and she denied it on December 20, 2011. (Resp. Ex. R).

While his reply (or renewal) papers were before Justice Wittner, petitioner moved for leave to appeal her March 18, 2011 order to the Appellate Division. (Resp. Ex. L). By order dated August 4, 2011 the First Department denied the leave application. (Resp. Ex. O).

By application dated January 24, 2012 but received by the court on July 19, 2012, Pequero sought leave to appeal to the Appellate Division from Justice Wittner's denial of his motion to renew. (Resp. Ex. S). By order entered January 31, 2013 the Appellate Division denied that leave request. (Resp. Ex. V).

In papers dated May 16, 2013 Pequero moved in the Appellate Division for a writ of error coram nobis. (Resp. Ex. W). He argued that his appellate attorney had been ineffective in failing to argue (1) that the trial court had erred in denying his 330.30 motion, (2)

9

that his convictions were against the weight of the evidence, (3) that the jury foreperson should have been dismissed and a mistrial granted because of an improper investigation of her by the State, and (4) that his trial counsel had been constitutionally ineffective in various respects. (Id. at 17-40). The Appellate Division denied this motion on December 12, 2013. (Resp. Ex. AA).

In papers dated January 7 and 8, 2014, Pequero moved to reargue the coram nobis motion. (Resp. Ex. CC). On June 24, 2014 the appellate panel denied that application. (Resp. Ex. DD).

Following this final rebuff by the state courts, Pequero turned to this forum, filing his petition, which is dated July 15, 2014.

ANALYSIS

We start by addressing respondent's contention that the petition is untimely. We then turn to an assessment of petitioner's various claims.

I. Timeliness

The statute of limitations for filing a federal habeas petition

is one year, and that time presumptively runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review...." 28 U.S.C. §2244(d)(1).[7] If no appeal is taken, the decision becomes final 30 days after sentencing. See Gonzalez v. Thaler, __ U.S. __, 132 S.Ct. 641 (2012); Bethea v. Girdich, 293 F. 3d 577, 578-79 (2d Cir. 2002). If a direct appeal is taken, the conviction is final when certiorari to the Supreme Court is denied or 90 days after the New York Court of Appeals affirms the conviction or denies leave to appeal. See Williams v. Artuz, 237 F.3d 147, 150-51 (2d Cir. 2001).

    Additionally, the statute provides that "[t]he time during

---

[7] Section 2244(d) offers three other dates that can trigger the running of the limitations clock, though none applies here:

    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §§ 2244(d)(1)(B)-(D).

which a properly-filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. §2242(d)(2); Fernandez v. Artuz, 402 F.3d 111, 112-15 (2d Cir. 2005). This provision "excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000). The time for the statute of limitations begins to run again from the date on which the state court issues a final order from which further appellate review is unavailable. See Saunders v. Senkowski, 587 F.3d 543, 549 (2d Cir. 2009).

If the statute of limitations has passed, in limited circumstances the doctrine of equitable tolling may allow a petitioner's case to proceed. Pace v. DiGuglielmo, 544 U.S. 408, 418 (2008); Smith, 208 F.3d at 17.  The remedy of equitable tolling should be used only in "rare and exceptional circumstances." Smith, 208 F.3d at 17. The doctrine is applied narrowly to reflect "Congress's decision to impose a limitations period on petitions for habeas." Jenkins v. Green, 630 F.3d 298, 305 (2d Cir. 2010). The Second Circuit has recognized that such tolling may not be invoked simply because "a potentially meritorious claim is at stake" or "a

petitioner [faced] daunting procedural obstacles." Id.

A petitioner must satisfy two requirements in order to qualify for equitable tolling: first, he must demonstrate "extraordinary circumstances", and second, he must prove "reasonable diligence." Id. at 302. The "petitioner seeking equitable tolling must demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of the filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." Jenkins, 630 F.3d at 303 (quoting Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000)). The determination of whether to grant equitable tolling is done on a case-by-case basis and is not based on "rigid and nonvariable rules." Dillon v. Conway, 642 F.3d 358, 362 (2d Cir. 2011). The burden is on the petitioner to demonstrate "the appropriateness of equitable tolling. . . . [I]n order to carry out this burden, she must offer a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights." Bolarinwa v. Williams, 593 F.3d 226, 232 (2d Cir. 2010). See also Smith v. Lee, 2013 WL 2467988, at *9 (S.D.N.Y June 7, 2013) (applying this principle to a pro se petitioner).

To determine whether a petitioner has met his burden of showing extraordinary circumstances, the "proper inquiry isn't how unusual but rather how severe an obstacle [the circumstance] is." Diaz v. Kelly, 515 F. 3d 149 (2d Cir. 2008). Circumstances that have warranted equitable tolling include the prison's confiscation of petitioner's draft petition and all related papers, see Valverde, 224 F.3d at 135, and an attorney's disregard for directions to file a habeas corpus petition, Baldayaque v. United States, 338 F.3d 145 (2d Cir. 2003); Dillon, 642 F.3d at 363, or his abandonment of his client. See Martinez v. Superintendent of Eastern Correctional Facility, __ F.3d __, 2015 WL 6874961, *4-6 (2d Cir. Nov. 10, 2015).

Apart from assessing whether the circumstances were sufficiently extraordinary, when analyzing the "reasonable diligence" prong the court should ask "did the petitioner act as diligently as reasonably could have been expected under the circumstances." Baldayaque, 338 F.3d at 153 (emphasis in original). See also Jenkins, 630 F.3d at 308. Moreover, "a showing of reasonable efforts requires more than episodic efforts; the petitioner must demonstrate that he 'acted with reasonable diligence throughout the period he seeks to toll.'" Davis v. Lempke, 2015 WL 509671, at *4 (S.D.N.Y Feb. 5, 2015) (quoting Smith, 208 F.3d at 17)(emphasis in original).

In this case there is no real dispute that Pequero's petition -- which we deem to have been filed on July 15, 2014, e.g., Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001) -- was filed after the running of the one-year time limit. On June 10, 2009, the New York Court of Appeals denied his application for leave to appeal from the First Department's affirmance of his conviction. Thus the one-year clock started to run 90 days later, on September 8, 2009. It was not stopped until August 5, 2010, when Pequero filed his 440.10 motion. At that point it had run for 331 days, only 34 days short of one year.

Petitioner's motion to vacate, his subsequent application that was deemed a motion to renew, and his various applications for leave to appeal Justice Wittner's adverse 440.10 rulings kept the clock stopped, at least arguably, until January 31, 2013, when the First Department denied his leave request pertaining to the denial of his motion to renew.

At that point the clock resumed running, and the one-year period expired 34 days later, on March 6, 2013. Pequero did not file another collateral challenge, however, until May 16, 2013, when he sought coram nobis relief in the Appellate Division. By that time 71 days had passed since the limitations period had expired. Taking

15

into account both the <u>coram</u> <u>nobis</u> motion and petitioner's application to reargue the denial of that motion, we exclude the period until the last order, denying the reargument request, which was issued on June 24, 2014. <u>See</u> <u>Diaz v. Kelly</u>, 515 F.3d 149, 155 n. 2 (2d Cir. 2007)(tolling ends on issuance of court decision, not its later receipt). Since petitioner did not file his habeas petition until July 15, 2014, that filing was 91 days late.[8]

In seeking to avoid the limitations defense, Pequero presses two arguments. First, he seeks equitable tolling based on the assertion that at crucial points various courts failed to provide him required notice of their decisions. If a petitioner can make such a showing and also demonstrate due diligence during the relevant periods of time, the court may recognize such a toll. <u>See</u>, <u>e.g.</u>, <u>Diaz</u>, 515 F.3d at 154-56. Second, he argues that he was actually innocent, a contention that, if proven, provides a basis to forgive an untimely petition. <u>See</u> <u>McQuiggin v. Perkins</u>, 133 S.Ct.

---

[8] We observe that after the Appellate Division denied petitioner's <u>coram</u> <u>nobis</u> application and his motion to reargue, he had thirty days to seek leave to appeal to the New York Court of Appeals. N.Y. Crim. Proc. L. § 460.10(1)(a). Since he failed to do so, he is presumably not entitled to credit him for that time period. <u>See</u> <u>generally</u> <u>Saunders</u>, 587 F.3d at 548 (no toll for 30 days permitted to defendant to move for reargument since he did not so move). In any event, even with such credit the petition would be untimely by 61 days.

1924, 1931 (2013); <u>Rivas v. Fischer</u>, 687 F.3d 524, 539-40 (2d Cir. 2012). To succeed on such a theory, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)(quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986)). To meet this standard, he must proffer new evidence that "unquestionably establishes" factual innocence, "not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623-24 (1998). Thus "a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" <u>McQuiggin</u>, 133 S.Ct. at 1935 (quoting <u>Schlup</u>, 513 U.S. at 327).

Petitioner cannot satisfy either tolling standard. For equitable tolling based on extraordinary circumstances, he asserts principally that the state courts repeatedly failed to provide prompt notice of their rulings, in contravention of requirements found in statute or court rules. In short, he seeks to place himself within the arc of circumstances recognized in <u>Diaz</u> as allowing at least the possibility of tolling. The first weakness in these assertions is that most of the instances of alleged delay in notification are either subsumed in the tolling for which our calculation gives him credit. Second, as for the longest alleged

delay in his learning of an adverse court ruling -- the four and one-half months stretching from the denial of his motion rearguing the Appellate Division denial of his second 440.10 leave application (occurring on January 31, 2013) until a purported late notice on May 13, 2013)(see Traverse at p. 9, ¶¶ 24, 27) -- he offers no documentation of the assertedly late notice, an evidentiary omission that undercuts his ability to carry his burden on both extraordinary circumstances and due diligence. Compare Diaz, 515 F.3d at 152-53, 155 (Appellate Division and prison had no record of timely notice to the petitioner).

Although the lack of documentary proof by petitioner might otherwise justify a further evidentiary inquiry, in this case the fatal flaw in Pequero's tolling argument is the undisputed fact that, following the denial of his leave application to the Court of Appeals on his direct appeal -- an event that occurred on June 10, 2009 and of which Pequero apparently received prompt notice -- he waited nearly 14 months before filing a 440.10 motion to vacate, thus leaving himself only 34 days on the one-year clock. In view of the fact that the clock starts to run as of the day on which a court decision is issued (not the day when the defendant receives notice of it), see Saunders, 587 F.3d at 549, this substantial delay by petitioner exposed him to the considerable likelihood that his time

would run even if he received prompt notice of all the many decisions flowing from his numerous further applications to the state courts. Cf. Rivas, 687 F.3d at 538 (attorney's delay in filing 440.10 motion not an extraordinary circumstance for tolling purposes). That is of course what then happened.

The petitioner's delay of nearly 14 months in filing his initial collateral challenge is not consistent with the requirements of due diligence. Indeed, were it otherwise, a defendant could run his clock down to only one or a few days before starting the process of collateral motions and almost certainly leave himself insufficient time to exhaust his remedies before turning to federal court. To then ignore the petitioner's own tardiness at the outset of the collateral-challenge process would entirely undercut the principle that the petitioner not only must have confronted extraordinary circumstances, but must also have proceeded with diligence throughout the relevant period.

As we have noted, the Second Circuit has observed that "[a] petitioner seeking equitable tolling must demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of the filing, a demonstration that cannot be made if the petitioner, acting with

reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." Jenkins, 630 F.3d at 303. In this case, even if we assume that the four and one-half months between January 31 and May 13, 2013 is properly tolled, it is plain that if Pequero had exercised reasonable diligence in filing his 440.10 motion -- for example, filing the motion only six (or even eight) months after the Court of Appeals denied leave on his direct appeal, rather than 14 months later -- he would have been able to satisfy the one-year rule even given the asserted delay in notification by the Appellate Division that it had declined leave to appeal the denial of his renewed 440.10 motion in January 2013. In short, Pequero cannot invoke equitable tolling based on a showing of extraordinary circumstances and reasonable diligence.

Petitioner also fails to justify his alternative cited ground for tolling, since he does not satisfy the demanding requirement for demonstrating actual innocence. He proffers no new compelling evidence, but rather relies on a set of three witness statements from his state-court submissions that address the possibility that a cooperating co-defendant -- Rayanaldo Mojica -- and not Pequero, had shot Tyrelle Williams or that he had shot Williams in self-defense. (Resp. Ex.  L (at motion exs. A-C; Traverse Ex. B at "Affidavit of Witness"). This proffer does not demonstrate

20

innocence. First, it does not address the second murder for which petitioner was convicted (that of Al Cruz) or the December 2003 shootout, which triggered both an attempted-murder charge and a number of other counts, nor does it address the drug-conspiracy charge; yet all of these charges were upheld by the jury. Second, the witness statements -- even if credited -- do not at all demonstrate Pequero's factual innocence in connection with the killing of Tyrelle Williams. As the Appellate Division noted in affirming petitioner's conviction regarding this incident, the trial evidence showed that after a rival drug dealer had threatened Mojica, Pequero and Mojica and a fellow gang member entered a building with drawn guns and in apparent search for the rival dealer, thus allowing the jury to infer that Pequero had the intent to commit a crime there, and since he was entering with Mojica, even if the latter fired the shots that killed Williams, petitioner would be guilty of felony murder, as well as burglary and weapon possession, all crimes for which he was convicted. In any event, the affidavits are simply arguable evidence and do not so undercut the trial testimony as to demonstrate that a jury would likely have found reasonable doubt even on the limited question of whether Pequero was the trigger man on that occasion.[9]

---

[9] The proffered statements also do not reflect the required "new reliable evidence." Doe v. Menefee, 391 F.3d 147, 161 (2d

In sum, the petition can be dismissed on the basis of untimeliness. Nonetheless, we further proceed to address Pequero's claims, and determine that -- timeliness aside -- none may trigger habeas relief.

## II. Assessment of Petitioner's Claims

Before confronting Pequero's five sets of claims for relief, we briefly summarize the criteria that apply to a habeas court's review of challenged state-court decisions.

### A. Habeas Review Standards

The stringency of federal habeas review turns on whether the state courts have passed on the merits of a petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)(discussing 28 U.S.C. § 2254(d)). The relevant statute states as follows:

An application for a writ of habeas corpus on behalf of a

---

Cir. 2004).

22

person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Harrington v. Richter, 562 U.S. 86, 97-98 (2011); Bell v. Cone, 535 U.S. 685, 693-94 (2002); Portalatin v. Graham, 624 F.3d 69, 78-79 (2d Cir. 2010)(en banc); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005).


Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Howard, 406 F.3d at 122 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000) (O'Connor, J.,

23

concurring)); see also Marshall v. Rodgers, 133 S.Ct. 1446, 1448 (2013).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Howard, 406 F.3d at 122 (quoting Fuller v. Gorcyzk, 273 F.3d 212, 219 (2d Cir. 2001). The Supreme Court observed in Williams that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "'[s]ome increment of incorrectness beyond error is required...[H]owever...the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)); accord Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

Under the Supreme Court's more recent, and arguably more

24

stringent, interpretation of the statutory language, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103. "As Harrington bluntly states, '[i]f this standard is difficult to meet, that is because it was meant to be.'" Young v. Conway, 715 F.3d 79, 98 (2d Cir. 2013) (quoting Harringon, 562 U.S. at 102).

As for a state court's factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see also Rice v. Collins, 546 U.S. 333, 338-39 (2006).

B. The "Weight of the Evidence" Claim

(i) A Cognizable Claim?

In the titling of petitioner's claims, he asserts one as follows: "Conviction is against the weight of the evidence". (Pet. Ex. E). In the petition itself, he does not further elaborate on the substance of that claim, though he does attach a copy of the Table of Contents from his attorney's Appellate Division brief, in which counsel argued the following: "THERE WAS INSUFFICIENT EVIDENCE TO CONVICT APPELLANT OF THE ALLEGED AUGUST 6, 2001 BURGLARY . . . . FURTHERMORE, IF THE BURGLARY CHARGE IS NOT SUSTAINED, THEN APPELLANT CANNOT BE CONVICTED OF A FELONY MURDER PREDICATED ON THE ALLEGED BURGLARY". (Resp. Ex. D at second page). In petitioner's traverse, he seems to take a broader approach to his claim than in his

26

petition, critiquing the purported weakness of the State's case against him on various counts. (Traverse at 27-29).

Respondent argues that Pequero's claim, deemed a "weight of the evidence" argument, is not cognizable. Alternatively, he argues that all but one aspect of Pequero's "sufficiency" theory is unexhausted and procedurally barred, and that the claim, however construed, is meritless. We conclude that petitioner's claim, properly understood, is cognizable as predicated on an "evidentiary insufficiency" argument, although it fails for other reasons.

It is well established that a habeas court may address only federal claims. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002). The Supreme Court has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." McGuire, 502 U.S. at 68 (citing cases).

Petitioner's claim that his conviction was against the weight of evidence is, as articulated, clearly grounded in New York state

27

law under Crim. Proc. L. § 470.15(5), and, on its face, is therefore not a cognizable federal claim. See, e.g., Cintron v. Fisher, 2012 WL 213766, *3 (S.D.N.Y. Jan. 24, 2012); Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006); Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) ("A federal habeas court cannot address 'weight of the evidence' claims because 'a challenge to a verdict based on the weight of the evidence is different from one based on sufficiency of evidence. Specifically, the 'weight of the evidence' argument is a pure state law claim . . . whereas a legal sufficiency claim is based on federal due process principles.'") (quoting Garbez v. Greiner, 2002 WL 1760960, *8 (S.D.N.Y July 30, 2002)).

A court, however, must liberally construe a pro se petition. See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972); Williams v. Cleary, 2 F. App'x 85, 86 (2d Cir. 2001); Askour v. Haouzi, 2012 WL 3561071, *1 (S.D.N.Y. Aug. 17, 2012). Therefore, "weight of the evidence" challenges are frequently analyzed as "insufficiency of the evidence" claims, which the Supreme Court has held are "cognizable in a federal habeas corpus proceeding." Jackson v. Virginia, 443 U.S. 307, 321 (1979). See, e.g., Brown v. Cunningham, 2015 WL 2405559, *9 (S.D.N.Y. April 22, 2015); Klosin v. Conway, 501 F. Supp. 2d 429, 439 (W.D.N.Y. 2007) (citing cases); Wilson v.

28

Senkowski, 2003 WL 21031975, *8 (S.D.N.Y. May 7, 2003). Moreover, in this case the pro se petition can be readily construed to assert an insufficiency claim since petitioner attached to his pleading a copy of the list of claims from his state-court appellate brief -- from which his petition seems to borrow -- and that appellate brief relies on an evidentiary-insufficiency articulation of the claim. Moreover, in petitioner's traverse he asks in substance, albeit without the greatest of clarity, that his claim here be so read. (Traverse at 18-19).

In short, the claim is subject to habeas assessment. That said, however, if construed as encompassing a challenge to all of the counts of conviction, the claim fails, as it is unexhausted and procedurally barred except with respect to the charges flowing from the shooting of Tyrelle Williams (a conclusion that we explain below), and the challenge to the Williams murder conviction is meritless.

(ii). Exhaustion of Claims/Procedural Bar

A petitioner is required to exhaust all of his legal remedies in state court, 28 U.S.C. § 2254(b)(1), a mandate that affords the state court an "opportunity to pass upon and correct alleged

violations of its prisoners' federal rights." <u>Baldwin v. Rose</u>, 541
U.S. 27, 29 (2004) (quoting <u>Duncan v. Henry</u>, 513 U.S. 364, 365
(1995)). The petitioner is required to "fairly present his claim in
each appropriate state court (including a state supreme court with
powers of discretionary review)." <u>Baldwin</u>, 541 U.S. at 29 (internal
quotation omitted); <u>see also Washington v. Goord</u>, 2010 WL 2594310,
*3-4 (S.D.N.Y. June 22, 2010).

On petitioner's direct appeal, he attacked the sufficiency of
the evidence solely with respect to the single counts of murder,
burglary and possession of a weapon resulting from the August 6,
2001 shooting of Mr. Williams. Thus Pequero failed to exhaust his
state-court remedies with respect to any other evidentiary-
insufficiency claim. <u>See</u>, <u>e.g.</u>, <u>Baldwin</u>, 541 U.S. at 29; <u>O'Sullivan
v. Boerkel</u>, 526 U.S. 838, 845 (1999). Petitioner has no current
state-court remedy for these claims, however, since he cannot pursue
a second direct appeal, <u>see</u>, <u>e.g.</u>, <u>Spence v. Sup't Great Meadow
Corr. Facility</u>, 219 F.3d 162, 170 (2d Cir. 2000), and he may not
obtain review by way of still another section 440.10 motion in view
of the fact that all of these versions of his evidentiary-
insufficiency claims could have been raised on his direct appeal.
N.Y. Crim. Proc. L. § 440.10(2)(c). Accordingly, these claims must
be deemed exhausted but subject to procedural-bar analysis. <u>See</u>,

30

e.g., Gray v. Netherland, 518 U.S. 152, 161 (1996); St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004). That analysis compels rejection of these claims.

Under procedural-bar rules, we may not review the merits of the claim unless petitioner can overcome his procedural default by either "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or [establishing] ... that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Fama v. Commissioner, 235 F.3d 804, 809 (2d Cir. 2000). Pequero cannot meet either of these tests.

To demonstrate cause, petitioner must establish that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," for example, by showing that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials... made compliance impracticable." Murray, 477 U.S. at 488 (citing Reed v. Ross, 468 U.S. 1, 16 (1984), and quoting Brown v. Allen, 344 U.S. 443, 486 (1953)). A petitioner may also satisfy the cause requirement by demonstrating that the failure of his attorney to comply with state procedural rules denied him constitutionally

31

adequate representation. See Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999). He cannot invoke this ineffective-assistance ground, however, unless he first asserted an equivalent independent Sixth Amendment claim in state court and exhausted his state-court remedies with respect to that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000). In any event, it bears emphasis that "[a] defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel." Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001).

The second exception -- that failure to review petitioner's claims would result in a fundamental miscarriage of justice -- is reserved for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496; accord Sawyer v. Whitley, 505 U.S. 333, 339 n.6 (1992). To establish "actual innocence," as we have already noted, petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley, 523 U.S. at 623 (quoting Schlup, 513 U.S. at 327-28) (internal quotation marks

32

omitted). In this context, "actual innocence means factual innocence, not mere legal insufficiency." Id. at 623. Furthermore, the petitioner must support his claim "'with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.'" Doe, 391 F.3d at 161 (quoting Schlup, 513 U.S. at 324); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002).

Pequero cannot demonstrate cause. His appellate attorney was free to assert evidentiary insufficiency with respect to all of the counts on which petitioner was convicted, and he plainly chose, in the exercise of sound judgment, to focus on the fatal shooting of Tyrelle Williams. Although petitioner, on his coram nobis petition, asserted a series of claims of ineffective assistance of appellate counsel, and targeted one portion of his argument on the failure of the attorney to challenge the sufficiency of the evidence on numerous counts other than those involving the Williams shooting (Resp. Ex. W at 34-40 (referring to charges of conspiracy, crimes involving the murder of Al Cruz and weapons charges), he never sought leave to appeal to the Court of Appeals from the denial of coram nobis relief, despite the availability of that mechanism. N.Y. Crim. Proc. L. § 450.90(1). That omission represents a failure to

exhaust his Sixth Amendment claim, and is fatal to an argument for cause and prejudice. See, e.g., O'Sullivan, 526 U.S. at 845-46. See generally Edwards, 529 U.S. at 451-52; DeSimone v. Phillips, 461 F.3d 181, 191 (2d Cir. 2006).

Petitioner also cannot demonstrate that failure to consider his unexhausted evidentiary-insufficiency claims would work a fundamental miscarriage of justice. As we have already noted, he fails to present a case for actual innocence, and the lack of the required showing of new, convincing evidence of such innocence is fatal to his effort to avoid a procedural bar for the same reasons as discussed above.

### (iii) The Exhausted Insufficiency Claim

Petitioner is thus left with the challenge to his conviction for the murder of Mr. Williams, and the related convictions for burglary and weapon possession. His claim is clearly meritless.

A conviction based on insufficient evidence violates the Due Process Clause of the Fourteenth Amendment. Jackson, 443 U.S. at 316. As the Supreme Court observed in Jackson,

> an essential of the due process guaranteed by the
> Fourteenth Amendment is that no person shall be made
> to suffer the onus of a criminal conviction except
> upon sufficient proof -- defined as evidence
> necessary to convince a trier of fact beyond a
> reasonable doubt of the existence of every element
> of the offense.

Id. The central inquiry on a challenge to the sufficiency of the

evidence "is whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable

doubt." Id. at 319 (emphasis in original).

This standard "leaves juries broad discretion in deciding what

inferences to draw from the evidence presented at trial, requiring

only that jurors draw reasonable inferences from basic facts to

ultimate facts." Coleman v. Johnson, __ U.S. __, 132 S.Ct. 2060,

2064 (2012); see also Santone v. Fischer, 689 F.3d 138, 148 (2d Cir.

2012); Harnett v. Conway, 2014 WL 6390285, *4 (S.D.N.Y. Nov. 17,

2014); Graham v. Lape, 476 F. Supp. 2d 399, 403 (S.D.N.Y. 2007)

("All permissible inferences are drawn in favor of the prosecution,

the verdict can be based entirely on circumstantial evidence, and

the government is not required to refute every possible hypothesis

supporting the defendant's innocence."). Most importantly, a court

will "defer[] to the jury's assessments of the witnesses'

credibility." <u>United States v. Parkes</u>, 497 F.3d 220, 225 (2d Cir. 2007)(quoting <u>United States v. Arena</u>, 180 F.3d 380, 391 (2d Cir. 1999)).

In sum, "on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." <u>Coleman</u>, 132 S.Ct. at 2062 (internal quotations omitted).

In this case it cannot be said that the holding of the Appellate Division to the effect that the evidence was sufficient to justify the conviction of Pequero for burglary in connection with the murder of Williams and for the related murder and weapon charges was unreasonable. Indeed, given the deference owed to jury findings on matters of credibility, it was plainly justified.

Rayanaldo Mojica testified that he had been threatened on August 6, 2001 by a rival drug dealer known by the sobriquet "Gorilla", who had been accompanied by two of his colleagues, including Tyrelle Williams. (Tr. 2166-67, 2174-75, 2242, 2246-47). According to Mojica, later that day he, together with Pequero and

another gang member, went to 875 Amsterdam Avenue -- apparently the expected location of Gorilla -- to "squash" their "problems" with him. (Tr. 2194). As recounted by Mojica, Pequero ran into the building with a drawn gun and chased an unknown person up the staircase. (Tr. 2172-73). Losing his prey, in Mojica's account Pequero then turned towards Williams and ordered him to take his hand out of his pocket. In response, Williams pulled out a gun, but held it by his side and pointed down, at which point Pequero shot him twice. (Tr. 2174-78). Additional corroboration was offered by other witnesses, who reported seeing Pequero approaching the building in an agitated state, and running from the building after the sound of gunshots. The State also offered testimony by another witness about a "rambling" phone call from Pequero shortly after, in which he referred to "doing something". (Tr. 1325-30, 1376-78, 1413-22, 1607-12, 1617-27, 2706-07, 2898-99).

This evidence plainly allowed the jury to find petitioner guilty of first-degree burglary. That crime is defined inter alia to cover a person who "enters or remains unlawfully in a dwelling with intent to commit a crime therein", if, while entering, remaining in or fleeing from the dwelling, either the defendant or another participant in the crime "is armed with . . . a deadly weapon" or "[d]isplays what appears to be a pistol . . . .". N.Y.

Penal L. §§ 140.30(1) & (4). In this case, the jury was free to infer that Pequero and his companions intended to obtain revenge for the earlier threats against Mojica, that he was holding a firearm before entering the building, that he or Mojica intended to use a firearm -- whether to kill or to frighten[10] -- and that he or one of his companions did use a gun to kill Williams. Thus, the evidence was ample to justify the burglary conviction. That conclusion in turn demonstrates the justification for the felony-murder conviction, since the statute defines that crime to encompass the commission of a burglary if, in the course of the commission of the burglary, the defendant or another person causes the death of an individual who was not a participant in the crime. N.Y. Penal L. § 125.25(3). Finally, the testimony of Mojica obviously also justified petitioner's conviction on the firearm charge.

In sum, the Appellate Division's rejection of petitioner's evidentiary-insufficiency claim was plainly correct, and most certainly did not contravene or unreasonably apply any Supreme Court precedent.

---

[10] As the Appellate Divison observed, at the very least the jury could find that petitioner intended to commit the crime of second-degree menacing under Penal Law § 120.14(1)(attempting to put a person in fear of injury or death by display of what appears to be a firearm). See Pequero, 60 A.D.3d at 543, 877 N.Y.S.2d at 231.

C. Denial of Justification Instruction

At trial defense counsel asked for a jury instruction on the defense of justification with regard to both a Christmas eve 2003 shootout in which petitioner had been involved, and the shooting of Tyrelle Williams on August 6, 2001. (Tr. 3189). The court granted the request with regard to the Christmas eve incident but not with respect to the murder of Williams. (Tr. 3848, 3960). Petitioner asserts that the refusal of the charge with regard to the Williams shooting denied him a fair trial. Respondent argues that the claim is meritless. We agree with respondent.

We start with the long-accepted principle that habeas court review of state courts' jury instructions is limited by the requirement that the petitioner demonstrate that the instruction, if error under state law, also violated his rights under the Constitution. See, e.g., Davis v. Strack, 270 F.3d 111, 1123-34 (2d Cir. 2001). Habeas relief is not available for a "mere error of state law", Blazic v. Henderson, 900 F.2d 534, 541 (2d Cir. 1990), but will be available if the petitioner can show that the refusal to provide a justification instruction violated state law and that "the erroneous failure to give such a charge was sufficiently harmful to make the conviction unfair." Davis, 270 F.3d at 124.

Before granting such relief, the court must answer three questions in favor of the petitioner: "First, was he entitled to a justification charge? Second, if so, did the failure to give one result in a denial of due process? Third, if so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?" Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir. 2005).

Under New York law, a defendant is entitled to a justification charge if there is a reasonable view of the evidence, viewed favorably to the defendant, under which such a defense is merited. See People v. Padgett, 60 N.Y.2d 142, 144-45, 468 N.Y.S.2d 854, 856 (1983); People v. Watts, 57 N.Y.2d 299, 301-02, 456 N.Y.S.2d 677, 679 (1982). See also Jackson, 404 F.3d at 622-23 (citing cases). The specific requirements for such a defense are embodied in Penal Law § 35.15, which states in relevant part:

> 1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:
>
> (a) The latter's conduct was provoked by the actor with the intent to cause physical injury to another person; or
>
> (b) The actor was the initial aggressor, except that in such case the use of physical force is nonetheless justified if the actor has withdrawn from the encounter and

effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force.

2. A person may not use deadly physical force upon another person under the circumstances specified in subdivision one unless:

(a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such a case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others, he or she may avoid the necessity of so doing by retreating . . . .

Applying these criteria, the appellate panel observed that "there was no reasonable view of the evidence, when viewed most favorably to defendant, to support that defense." In support of that conclusion the panel correctly noted that "defendant was clearly the initial aggressor", and that, although Williams was armed, the evidence did not suggest that Pequero "believed he was in imminent danger of the deceased's use of deadly physical force or that such belief was reasonable". As the court noted, Williams pulled his gun out only in response to a command from Pequero to take his hand out of his pocket, and he held the gun at his side, presumably because Pequero was pointing a gun at him. Pequero then announced that Williams had a gun and proceeded to shoot him twice. Pequero, 60 A.D.3d at 543, 877 N.Y.S.2d at 231.

The panel opinion accurately describes the testimony of Mojica, and, given that unrebutted testimony, it is obvious that the trial record, even construed favorably to petitioner, did not justify the invocation of section 35.15 in the face of petitioner's armed entry, his initial chase after another person in the hallway, his gun pointed at Williams, his command that Williams remove his hand from his pocket, Williams' holding his gun pointed downward by his side, and petitioner's use of deadly force against a victim who posed no obvious immediate danger to him.[11] It is equally apparent that the appellate court's decision did not unreasonably apply any Supreme Court precedent.[12]

---

[11] Indeed, it appears that Williams himself might well have had a justification defense if he had shot Pequero instead of holding his gun by his side. See Penal L. § 35.15(2)(a).

[12] Given these conclusions, we need not address whether the erroneous denial of a justification instruction would have been so prejudicial as to violate petitioner's right to due process, although we note that the jury declined to convict petitioner of first-degree murder for this incident and convicted him only of felony murder. At least one Appellate Division department has held that a justification defense is not available to defeat a charge of felony murder, since the felony-murder statute covers any death of a non-participant caused during the course of various specified felonies. See People v. Walker, 78 A.D.3d 63, 66-71, 908 N.Y.S.2d 419, 422-25 (2d Dep't 2010).

42

D. <u>The Massiah Claim</u>

Petitioner complains about the admission into evidence of testimony by two men who had shared jail space with him prior to trial. One of the men, Isaac Scott, was incarcerated with Pequero in September 2001, and testified that petitioner had told him that "he shot one of them on the corner in front of everybody [apparently referring to Al Cruz] and shot the other in the lobby and put his brains on the mailbox." (Tr. 1860-63). The other witness, Francois Beauchamp, who was held in jail with Pequero in April 2006, testified that petitioner had said he was "good" because "they have no murder weapon and and they don't have no witnesses" and that he had added that "he was all right with the first one but the second one, it was daytime." (Tr. 1337-38, 1379-80). Petitioner complains that these two men were cooperating with the State when he spoke to them, and that consequently their testimony violated his right to counsel.

Respondent argues that this claim is procedurally barred. Alternatively, he asserts that the claim is baseless since the evidence does not reflect that these witnesses were working for the prosecutor when petitioner made his inculpatory statements. We conclude that the claim is not barred but is meritless.

43

1. <u>Procedural Bar Criteria</u>

If the highest state court to address a federal-law claim disposes of it on a "state law ground that is 'independent of the federal question and adequate to support the judgment,'" a federal habeas court may not review that claim unless the petitioner demonstrates both cause for his default and prejudice or else establishes that a failure to address the claim would constitute a fundamental miscarriage of justice. <u>See</u>, <u>e.g.</u>, <u>Cone v. Bell</u>, 556 U.S. 449, 465 (2009) (quoting <u>Coleman</u>, 501 U.S. at 729); <u>see also</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 136 (2d Cir. 2006) (citing <u>Harris v. Reed</u>, 489 U.S. 255, 260 (1989)). A state procedural rule can qualify as an adequate and independent state-law ground. <u>See</u> <u>Harris</u>, 489 U.S. at 260-61.

To be independent, the state-law holding must rest on state law that is not "'interwoven with the federal law.'" <u>Jimenez</u>, 458 F.3d at 137 (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983)). Since it can be "'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference,'... reliance on state law must be 'clear from the face of the opinion.'" <u>Fama</u>, 235 F.3d at 809 (quoting <u>Coleman</u>, 501 U.S. at 732, 735). When determining whether we may entertain a

44

claim, we "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000)).[13]

As for the requirement of adequacy, the state procedural rule must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." Murden, 497 F.3d at 192 (quoting Monroe, 433 F.3d at 241); see Lee v. Kemna, 534 U.S. 362, 376 (2002); Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003) (citing Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999)). However, principles of comity caution against categorizing a state procedural rule as inadequate "lightly or

---

[13] In this regard, even if the appellate court rejects the claim as unpreserved and then, in the alternative, notes that if it had reviewed the merits it would have rejected the claim, the ruling is deemed, for this purpose, to have rested on the state-law procedural ground. See Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) ("Even where the state court has ruled on the merits of a federal claim 'in the alternative,' federal habeas review is foreclosed where the state court has also expressly relied on the petitioner's procedural default.") (citation omitted); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); cf., e.g., Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (state court's "contingent observation" is not an "adjudication on the merits" for purposes of habeas review).

without clear support in state law." <u>Garcia</u>, 188 F.3d at 77 (internal quotation marks omitted).


In this case respondent's argument for a procedural bar fails because the decision of the Appellate Division, insofar as it addresses the <u>Massiah</u> argument, does not unambiguously rest on an independent state-law ground. Pequero's trial lawyer did not pursue this issue below, and on appeal petitioner nonetheless argued the <u>Massiah</u> claim and asserted that the failure of trial counsel to pursue it amounted to ineffective assistance, an argument that, if credited, could permit appellate review of the underlying claim by way of a Sixth Amendment analysis. In response, the State noted Pequero's failure to raise the issue in the trial court, acknowledged the argument as to ineffective representation and its potential for allowing appellate review of the <u>Massiah</u> claim, and then proceeded to make the point that, by virtue of the trial lawyer's diffidence, the <u>Massiah</u> theory foundered because there was no evidence in the record that Messrs. Scott and Beauchamp were acting as agents for the State when Pequero made his inculpatory statements. (Resp. Br. 36-42 (citing <u>People v. Kinchen</u>, 60 N.Y.2d 772, 773-74, 469 N.Y.S.2d 680, 681 (1983)).


With this context, when the panel addressed the <u>Massiah</u> issue

46

it did not rule that petitioner had forfeited, or failed to preserve, the claim. Rather, the court stated that "[t]he record does not support defendant's speculative claim, raised for the first time on appeal, that two witnesses to whom he made inculpatory statements while in prison were acting as agents of the prosecution, thereby violating his right to counsel". The panel then concluded that "[s]ince the existing record does not reveal a factual basis for such a claim, defendant's argument that his trial counsel rendered ineffective asistance by not raising this issue is unreviewable on direct appeal." Pequero, 60 A.D.3d at 543-44, 877 N.Y.S.2d at 231.

In view of the wording of this assessment, it plainly cannot be said that it is "'clear from the face of the opinion,'" Fama, 235 F.3d at 809 (quoting Coleman, 501 U.S. at 732, 735), that the court's holding rested on state law that is not "'interwoven with the federal law.'" Jimenez, 458 F.3d at 137 (quoting Michigan, 463 U.S. at 1040-41). Indeed, quite to the contrary, the panel invoked federal law by relying on the absence of proof in the record that the witnesses were agents of the State. That is a substantive requirement under Massiah and its progeny, and hence the holding of

the court was "interwoven with the federal law."[14]


2. The Merits


To find a Massiah violation, the court must determine that at the time of the defendant's statement, his interlocutor was acting as an agent of the government and "deliberately elicited" the statement. See Maine v. Moulton, 474 U.S. 159, 173 (1983). A private citizen is not such an agent if he elicits an incriminating statement without government instruction or direction, even if he then turns over the statement to prosecutors. See, e.g., United States v. Henry, 447 U.S. 264, 271 (1980); United States v. Whitten, 610 F.3d 168, 193 (2d Cir. 2010). Moreover, even the existence of a cooperation agreement does not necessarily turn an informant into an agent for Massiah purposes. "An informant becomes

---

[14] In seeking to invoke a procedural bar, respondent points to a decision cited by the panel to the effect that an appellant must develop a record in the trial court sufficient to permit review of his appellate arguments. (Resp. Br. 35-36)(citing inter alia People v. Kinchen, 60 N.Y.2d 772, 469 N.Y.S.2d 680 (1983)). Given that mode of analysis, which commands a review of the evidentiary record, the petitioner's failing in this respect still involves the appellate court in an assessment of what factual development is needed to sustain a federal claim and whether the record adequately supports it. For procedural bar purposes, that is not the same as an appellate ruling that the failure to raise a legal argument below represents a forfeiture of that claim or a failure to preserve it.

a government agent vis-a-vis a defendant when the informant is 'instructed by the police to get information about the particular defendant.'" Id. (quoting United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997)).

The evidence pertinent to this issue is found in the testimony of Messrs. Scott and Beauchamp. Scott had a conversation with Pequero in September 2001, but did not enter into a cooperation agreement with the State until 2006. (Tr. 1860-63; Resp. Ex. GG). There is no indication in the record that he was acting in any capacity for law enforcement five year before he entered into that agreement and five years before Pequero was indicted. As for Beauchamp, who was a member of the same gang as petitioner, he was arrested in April 2006 and spoke to petitioner only days later, but did not enter into a cooperation agreement with the State until August 2006. (Tr. 1334-36, 1379-80; Resp. Ex. GG). As with Scott, the record is bare of any indication that the State played any role in asking for, or encouraging, Beauchamp's conversations with Pequero.

The conclusion by the Appellate Division that there was no evidence that these two individuals were acting as agents of the State at the relevant time periods is plainly consistent with the

49

trial record, and cannot be deemed to be an unreasonable finding by the appellate panel. Necessarily, then, the court's rejection of the <u>Massiah</u> claim is unassailable.

### E. The Questioning and Investigation of the Foreperson

Petitioner next argues that he was denied a fair trial because the trial judge declined to disqualify the foreperson, Ms. Mejia, following an assertedly improper investigation of her by the prosecutors during the trial. In substance petitioner seems to be saying (1) that Ms. Mejia's independence was compromised by repeated questioning of her by the court on three occasions during the course of the trial, (2) that the prosecutors -- anxious to be rid of her -- undertook an impermissible inquiry and determined that she lived near or at the site of the charged criminal activity, on the upper West Side of Manhattan, and (3) that, in view of this disclosure, the court should have dismissed her, either because she was in effect intimidated by the court's repeated inquiries or because, given her residence near where the actions at issue had taken place, she may have had personal knowledge of the facts.

Respondent argues that petitioner failed to exhaust his state-

court remedies on this claim, and that it is procedurally barred.
He further asserts that the claim is groundless. We agree on both
points.

### 1. Procedural Bar

Petitioner raised the issue of the handling of the foreperson
in his counsel's 330.30 motion. (Resp. Ex. A ¶¶ 3-19). In doing so
he appeared to complain about the repeated questioning of Ms. Mejia
by the court and the State's belated investigation of her, but he
also stated that while "[t]he underlying purpose of all these
actions w[as] an attempt by the District Attorney to require the
Court to discharge the juror. . . .", "the Court properly resisted
these efforts . . . . " (Id. ¶ 18). Petitioner did not include a
claim of this sort on his direct appeal, however, and only
retrieved it, in the form of a complaint about the constitutional
adequacy of his appellate attorney, on his coram nobis application.

This sequence demonstrates a failure by Pequero to exhaust
whatever claim he is now asserting regarding the handling of the
foreperson. Since the relevant events were in the trial record, he
was required to pursue the issue on his direct appeal, but he
failed to do so. Although he subsequently raised the issue before

the Appellate Division by means of his <u>coram</u> <u>nobis</u> application, that does not satisfy the exhaustion requirement. As the Supreme Court has observed, to exhaust state-court remedies, the habeas petitioner must "fairly present" those claims in the proper state-court fora and do so in accord with whatever procedure is sanctioned by state law. "[W]here the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefor, . . . [r]aising the claim in such a fashion does not, for the relevant purpose, constitute 'fair presentation.'" <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989)(citing cases). <u>Accord</u>, <u>e.g.</u>, <u>Acosta v. Artuz</u>, 575 F.3d 177, 185-86 (2d Cir. 2009).

That is precisely the failing in petitioner's attempt to exhaust the present claim. The <u>coram</u> <u>nobis</u> application did not present the juror claim, only the ineffective-assistance claim. Moreover, <u>coram</u> <u>nobis</u> cannot substitute for a direct appeal, since its availability is limited to issues for which there is no other mechanism for presentation to the state courts. <u>See</u> <u>People v.</u> <u>Syville</u>, 15 N.Y.3d 391, 399-400, 912 N.Y.2d 477, 482-83 (2010); <u>People v. Bachert</u>, 69 N.Y.2d 593, 595-98, 516 N.Y.S.2d 623, 624-26 (1987). Since petitioner had an available avenue by way of a direct appeal, there was no basis to expect the Appellate Division to

consider the merits of his claim about the handling of the foreperson even if he had sought to raise it explicitly by way of the coram nobis petition.

Since petitioner did not exhaust this claim and has no currently available remedy in state court, it must be deemed procedurally barred unless petitioner can demonstrate cause and prejudice or establish that a failure to consider it would constitute a fundamental miscarriage of justice. Pequero fails on both counts.

Petitioner was not prevented from asserting the claim on his direct appeal. Plainly, however, appellate counsel thought it not a persuasive argument and therefore omitted it. As for the possibility of showing cause based on a Sixth Amendment theory, apart from the evident meritlessness of such an argument,[15] petitioner is precluded from pursuing that tack since he failed to exhaust such a claim in state court. As noted, he mentioned the issue in his coram nobis application, but after the Appellate

---

[15] We address below the merits (or lack thereof) of an attack on the trial court's dealings with the foreperson. See pp. 54-64, infra. We conclude that this claim is baseless. Equally baseless is petitioner's criticism of his appellate attorney for omitting such an argument.

Division denied the motion, he never sought leave to appeal to the Court of Appeals from that decision. That omission constitutes a failure to exhaust his remedies on the Sixth Amendment claim and thus precludes its use to establish cause.

As for the fundamental-miscarriage exception to procedural bar, petitioner does not even remotely make a showing of actual innocence, much less attempt to demonstrate that, but for the asserted mistreatment of the foreperson, he would have been acquitted. Thus he cannot avoid procedural bar on this basis either.

2. <u>Merits</u>

Even if we ignored the procedural bar, the result would not change. Petitioner fails to demonstrate any constitutional violation in the court's handling of a series of issues related to the foreperson. We first summarize the pertinent events, which involved three separate colloquies concerning that juror.

a. <u>First Colloquy</u>. During the course of the trial, the prosecutor advised the court that a testifying undercover officer had observed defendant Pequero making gestures, including sticking

out his tongue, and mouthing words -- possibly "I love you or something more graphic" -- to the foreperson, and the foreperson responding. (Tr. 798-99). The judge asked the court staff whether they had seen anything, and a court officer reported seeing "unusual behavior" from the foreperson, specifically that she had been "gazing" at Pequero and exchanging smiles with him. (Tr. 800). The officer reported also finding a note on the defense table where Pequero had been sitting, and it read "Why all the chicks on the jury feeling you". (Tr. 800-01). The judge also noted that Pequero had been "smiling, gestur[ing]" and "placing his hand over his face" when the jury entered and left the courtroom. (Tr. 806).

The prosecutor asked the court to "tact[fully]" raise the issue with Ms. Mejia. (Tr. 808). Over defense counsel's objections, she agreed to do so, noting that "flirtation[]" between a juror and a defendant was a "very serious mattter". (Tr. 801, 804-05).

The judge brought Ms. Mejia in, greeted her and asked her a few questions. She first asked the foreperson whether she had seen "any defendant . . . trying to make contact with you through his eyes or hand gestures or smiling or anything like that". The juror responded "[n]ot that I know of." The court then asked whether the juror herself had smiled or waved "or anything like that" at any of

the defendants, and she denied doing so. Finally, the court asked whether Ms. Mejia was then smiling because she was "nervous", and the juror said that she was. (Tr. 809-10). The juror was then excused, and the judge observed that her behavior could be attributed to nervousness and that there was no basis to discharge her. (Tr. 812-14).

b. Second Colloquy. Just before summations, the judge informed counsel that, late in the prior week, Ms. Mejia had advised a court officer that she had airline tickets for the next week. (Tr. 3275). The juror was brought to the robing room and informed the court and counsel that she had a ticket to fly to Miami on Thursday of that week and to return on Sunday and that she had bought the ticket before the trial started in order to visit an ill grandmother. (Tr. 3276-78). The judge noted that Ms. Mejia had not mentioned this during voir dire and that she should have done so, but Ms. Mejia observed that at the time the trial had been projected to end before her scheduled trip. (Tr. 3276-77). The judge then noted that she had told the jury that deliberations could last between two and ten days, and she then asked Ms. Mejia whether, if she could not go on the trip, she could undertake "full consideration of the case and give us a fair and just verdict based on the evidence." At that point Ms. Mejia said "I don't know." (Tr. 3277-78). The judge then

asked Ms. Mejia to try to change her ticket, noting that the schedule of the trial could not be altered to suit Ms. Mejia's convenience -- "there's a lot of people involved in this situation" -- and the juror agreed to attempt to do so. (Tr. 3279-80).

The judge then excused Ms. Mejia and asked the lawyers whether they would consent to discharging her. Counsel for Pequero and Tony Council declined to consent. (Tr. 3279-80).

The next day the judge asked Ms. Mejia whether she had been able to confirm that she could change the ticket, and she responded that it would be feasible if she paid a fee. The judge then asked her whether, given the request of the court for her to make the change, she would "still be able to be a fair and impartial juror[.] You're not going to hold it against either side in your deliberations?", and Ms. Mejia responded "No." (Tr. 3633-34). The judge then asked "You're going to decide the case on the [e]vidence only and the law?" The record indicates that Ms. Mejia shook her head affirmatively. (Tr. 3634). The court followed by asking whether she "wouldn't be upset to the extent that it will affect your ability to be a fair juror?", and Ms. Mejia responded "No". Finally the judge asked whether her grandmother's illness upset her, and the juror responded that it did but that "it's not such a

big deal" and also confirmed that she could "give [the case her] full attention and decide the case on the evidence an[d] the law." (Tr. 3635).

c. <u>Third Colloquy</u>. During a break in the summations, the prosecutor advised the court that he had learned that Ms. Mejia resided "extremely close" to the Douglass Houses, which was the location of the activity that formed the basis for the charges on trial. (Tr. 3644, 3646, 3650). He further observed that her building was so close by that it appeared in one of the crime-scene photos and a diagram, and that she was living virtually across the street from the location of one of the charged murders. He further noted that Ms. Mejia had not mentioned her proximity to the crime scene during jury selection, and that she necessarily had repeatedly violated the court's admonition to the jurors not to visit any crime scene. (Tr. 3644, 3649-51). He also represented that Ms. Mejia lived with her mother and that between 2000 and 2003 four different inmates had called one of the four telephones in that apartment, leaving open a question as to whether the juror had any incarcerated family members. He therefore asked the judge to question her. (Tr. 3644-54).

Defense counsel objected. In doing so, they stated that Ms.

Mejia had not been asked her address during voir dire. They also complained that the judge had been unduly brusque with the jurors during the trial, and they suggested that questioning Ms. Mejia would only frighten her. (Tr. 3656-57, 3659, 3661).

The judge noted that in her experience potential jurors who lived near a crime scene would mention that fact, and if specific addresses were referred to at trial, the jurors would let the court know of their familiarity with the neighborhood. (Tr. 3654-55, 3659-60). In any case the judge chose to question Ms. Mejia.

The juror said that she thought that she had mentioned her address during jury selection. When asked whether she goes through the area where the crimes were alleged to have taken place, she stated that she did not because she lives on Central Park West and had no reason "to go over there", apparently referring to Amsterdam or Columbus Avenues. (Tr. 3664-65). She was then excused, and the court ruled that it would not discharge her. (Tr. 3665, 3667-68, 3749).

d. Assessment.

The precise legal theory underpinning petitioner's complaint

about the questioning of Ms. Mejia is unclear. In his 330.30 motion he appeared to complain about the State's investigation of her residence and the repeated questioning of her, although he seemingly endorsed the court's refusal to remove her from the jury. (Resp. Ex. A at p. 18). In his <u>coram</u> <u>nobis</u> application, he appeared to be arguing that she should have been removed (Resp. Ex. W at 40-44), an assertion that he reiterates in this proceeding. (<u>See</u> Traverse at 38-42). We infer that he is currently asserting a due-process violation based on a contention either that the judge's inquiries so influenced the foreperson as to bias her, or that the fact that she lived near the scene of th charged crimes meant that she was biased and hence for that reason Pequero was denied a fair trial. In any event, he is plainly arguing that she should have been removed from the jury.

This form of argument is meritless. It bears mention, at least for context, that although Pequero failed to raise these issues on his direct appeal, one of his co-defendants -- Tony Council -- did so, and the Appellate Division squarely rejected the claim. <u>People v. Council</u>, 98 A.D.3d 917, 918, 951 N.Y.S.2d 149, 150-51 (2012). In addressing this issue, the Appellate Division in <u>Council</u> held that the three sets of inquiries of Ms. Mejia "did not deprive defendant of a fair trial." As found by the panel, "[t]he repeated inquiries

were necessary because three separate issues arose during the trial as to the foreperson's ability to serve as a fair and impartial juror. We do not find that the repeated questioning was intimidating, or that it caused defendant any prejudice." Id. at 918, 951 N.Y.S.2d at 150-51.

We assume for present purposes that if a judge deals improperly with a juror in a manner that may interfere with that juror's ability to render a fair verdict, a defendant may have a basis for a due-process claim predicated on the denial of an unbiased jury and hence the failure to provide a fundamentally fair trial. That said, the record here does not remotely suggest such a scenario. Moreover, the findings of the Appellate Division in this respect in Council are plainly reasonable, and its holding obviously does not contravene or unreasonably apply Supreme Court precedent.[16]

As the panel noted, three separate issues arose as to the foreperson's behavior and possible exposure to information that

---

[16] We need not decide whether the Appellate Division findings on the related appeal by Council are entitled to deference in this case, as they were in Council's separate habeas proceeding. Council v. Superintendent Capra, 14 cv. 1849, Doc. #27, Report & Recommendation at 56.

should not have reached the jury. In each instance, the trial judge handled the matter appropriately.

The fact that a number of observers, including not only the witness, but a court officer and the judge, all noted what appeared to be some interaction, possibly flirtatious, between the juror and Pequero was a cause for concern and triggered a need for an inquiry. Moreover, the judge proceeded in a cautious, brief and circumspect manner in questioning the juror, and plainly did not act in a manner that would likely intimidate the juror, even if she was a fairly fragile or nervous individual.

As for the juror's scheduling conflict, it arose in the midst of the trial and presented a potentially serious difficulty for the court in keeping the trial on track. Indeed, New York law prohibits suspending jury deliberations for more than 24 hours at a time, thus precluding a longer break to accommodate this juror's absence for several days of available trial time. See N.Y. Crim. Proc. § 310.10(2). In short, the judge was certainly justified in following up on the juror's belated message to the court officer posing that conflict as the trial was taking longer than expected. Moreover, although the judge was mildly, and briefly, critical of the juror's failure to mention this problem earlier in the process, she handled

the brief questioning in a neutral and non-confrontational way, and elicited from the juror a willingness to rearrange her flight plans. The court was also careful to elicit from the juror a series of assurances that the need to change her ticket and her concerns about her grandmother would not interfere with her ability to render a fair and impartial verdict. Again, there is no indication in the process of any bias or any intimidation or potential for swaying the juror in her deliberations.

Finally, the third round of questioning, elicited by the prosecutor's report that Ms. Mejia was living in virtually the shadow of the crime scene, does not suggest that the juror was in any way going to be influenced in her assessment of the case by the court's posing of a few questions concerning where she lived and whether she had been passing through the scene of much of the alleged gang activity that was the subject of the trial. It is also obvious that the prosecutor was entirely justified in checking on whether the juror was, by virtue of her residence, in violation of the court's instructions at the outset of the trial not to visit the scene of the alleged crimes, and the court was fully justified in seeking assurances from the juror on that point. It is an obligation of the judge to prevent any taint of the jurors and, if that has occurred, to find it and take appropriate remedial

measures. That is all that the judge did in this instance. Moreover, the trial judge's finding that the juror was not biased is a factual determination that is entitled to habeas court deference, e.g., Fama, 235 F.3d at 813. In this case petitioner offers no reason to question the reasonableness of that determination.

The trial judge necessarily has broad discretion in handling the jury with an eye to ensuring an unbiased outcome of the case. See, e.g., United States v. Aiello, 771 F.2d 621, 629 (2d Cir. 1985). See generally United States v. Parker, 903 F.2d 91, 101 (2d Cir. 1990). In this case the record reflects that Justice Wittner acted properly in that regard in her dealings with the foreperson, and her handling of the matter did not result in any discernible prejudice to petitioner.

F. The Ineffective Assistance Claims

Petitioner's final claim is a potpourri of critiques of his attorney's performance before and at trial. These include (1) the adequacy of his pretrial motion to sever his case or the homicide charges, (2) his failure to argue that the prosecutor had violated Crim. Proc. L. § 60.22(1) before the grand jury; (3) his failure to

challenge the court's jury instructions; (4) the lawyer's concession of other crimes committed by his client and his purported failure to argue "actual innocence", (5) the attorney's asserted failure to conduct an adequate pre-trial investigation; (6) his failure to ask for a missing-witness instruction, a missing-witness order and sanctions for evidence destruction and (7) his failure to move to dismiss the indictment under Crim. Proc. L. §§ 40.20 and 200.60. (Pet. Ex. E). None of these Sixth Amendment arguments can be sustained.

To prevail on an ineffective-assistance claim, the defendant must demonstrate both that his counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for his counsel's unprofessional errors, the result below would have been different." Padilla v. Kentucky, 559 U.S. 356, 366 (2010)(quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)). See also Chaidez v. United States, 133 S.Ct. 1103, 1107 (2013). In making this assessment, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time." <u>Strickland</u>, 466
U.S. at 689. A defendant "may not claim ineffective assistance of
counsel merely because in hindsight he thinks counsel's trial
strategy was inadequate." <u>United States v. Sanchez</u>, 790 F.2d 245,
253 (2d Cir. 1986). As for prejudice, the focus is "on the question
whether counsel's deficient performance renders the result of the
trial unreliable or the proceeding fundamentally unfair." <u>Lockhart
v. Fretwell</u>, 506 U.S. 364, 372 (1993). As noted, the defendant must
show "that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would
have been different." <u>Strickland</u>, 466 U.S. at 394.


Judged by these standards, petitioner fails to demonstrate a
Sixth Amendment violation. He also fails to show that the trial
court's rejection of these claims unreasonably applied Supreme
Court precedent.


We start by noting that Pequero's attorney pursued an
aggressive strategy in defense, both before, during and after
trial. Before trial he moved, albeit unsuccessfully, for severance.
During trial he engaged in cross-examination of the cooperating
witnesses in a manner designed to demonstrate their unreliability
based on self-interest. He also pressed for a justification defense

to the Williams shooting. Moreover, although he was forced to concede some of the overt acts charged in the indictment since petitioner had previously been convicted on two of the underlying drug transactions, he pursued the argument that the State was unable to link petitioner to the charged conspiracy. He also complained about the judge's questioning of the foreperson, both at the time and in a post-trial 330.30 motion. He further sought, by the same motion, to set aside the murder conviction grounded on the shooting of Williams. The fact that petitioner was convicted proves only that counsel, faced with a very strong prosecution case, was not a miracle worker, not that he was incompetent.

As for petitioner's specific complaints, we address them in order. As noted, he complains about the severance motion, implying that if his attorney had done a better job on it he would have prevailed. This is wishful thinking. Indeed, he fails to demonstrate any shortfall in the motion papers, and in any event the motion was destined to fail, for reasons noted in the Appellate Division decisions affirming the convictions of both Tony Council and his cousin Tyrone Council. See Council, 98 A.D.3d at 918, 951 N.Y.S.2d at 150; People v. Council, 52 A.D.3d 222, 222, 859 N.Y.S.2d 152, 153 (1st Dep't 2008). Briefly stated, the State presented overwhelming evidence that the homicides were linked to

67

the drug business of the defendants, and there was no prospect that Pequero would offer evidence conflicting with that of any of his co-defendants on trial.[17]

Petitioner next complains in vague terms about his attorney's supposed failure to invoke N.Y. Crim. Proc. L. § 60.22, which the State asssertedly violated before the grand jury, and counsel's asserted failure to ask for an interested-witness charge. His point is, to say the least, obscure. The cited statute requires that a conviction rest on more than the uncorroborated testimony of an accomplice, and the State here plainly more than satisfied its requirements at trial. (See Resp. Ex. C ¶ 35). As for what evidence was presented to the grand jury, counsel requested a review of the

---

[17] In petitioner's motion to vacate, he also complained that his attorney did not let him testify, implying that he would have denied being a part of the conspiracy. (Resp. Ex. H at pp. 22-23). The record at trial shows no objection by him when his attorney represented to the court that he did not wish to testify (Tr. 3201-02), and thus we infer that he was actually complaining about the attorney's undoubted, and very sensible, advice to him not to take the witness stand. He appears to be implying that such testimony would have demonstrated a conflict with his co-defendants, thus justifying severance, but there would have been no conflict since all of the defendants were contending that they were not involved in the conspiracy.

In Pequero's 440.10 motion he also complained that his attorney had not protested the failure of the State to provide notice that it was going to prove multiple conspiracies. (Resp. Ex. I at 21-22). The short answer is that the State successfully endeavored to prove a single conspiracy.

pertinent transcripts, and the court reviewed them and found that the evidence presented there was sufficient. (Resp. Exs. HH, II). Pequero offers no basis to question that conclusion, or his attorney's handling of the matter. As for interested witnesses and the accomplice-corroboration rule, the trial court provided fully adequate instructions to the jury on these subjects. (Tr. 3766-72).

Petitioner further complains that his attorney took an "adverse position", and did not advance a defense of "actual innocence". (Resp. Ex. E ¶ 1(A)). Neither criticism is valid.

Petitioner's first point seems to be a reference to his counsel's opening statement, in which he acknowledged the undeniable -- that petitioner had previously been convicted for some of the charged overt acts, specifically two drug sales. (Tr. 49-50). His point was to emphasize to the jury that this history did not necessarily mean that Pequero was part of the currently charged drug conspiracy. That strategy made perfect sense since there was no escaping his client's past history of convictions on those drug sales.

As for the "actual innocence" question, apart from referring to counsel's concession of petitioner's prior drug convictions,

69

this may amount to a complaint by Pequero that his attorney asked for a justification instruction regarding both the Williams killing and the Christmas eve shootout, a request that implied that Pequero had played a role in both events. Given the evidence of Pequero's direct involvement in both incidents, the strategy of the lawyer was sound; a justification defense, if it succeeded, would result in an acquittal of petitioner on both charges, and was more consistent with the evidence that the State presented than a denial that Pequero had been involved.

Petitioner next complains that his attorney did not investigate the case. The only support for this contention is found in his statement that he advised his lawyer to talk to three individuals with information indicating that Mojica had told them that he had killed Tyrelle Williams (see Resp. Ex. I at ¶ 30 (referring to Tyrel Gray, Preston Jones and Jerome Williams), and his proffer of statements from three individuals -- whether the same ones or not is unclear -- who he implies would have been useful witnesses if called. (Resp, Ex. L at exs. A-C (proffering statements on behalf of Ronald Williams, Rafael Garcia and Shawn Dunson).[18]

---

[18] Respondent notes that Pequero raised this "failure to investigate" complaint in his 440.10 motion but did not proffer

This proffer certainly does not demonstrate a failure by counsel to conduct any investigation. It appears rather that Pequero believed that his attorney should have called some of these men to testify, but there is no indication how these individuals would have advanced his case, and in any event a trial lawyer has broad discretion in deciding whom, if anyone, to call as a trial witness. See, e.g., Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005).

In this case the proffered statements underline obvious reasons not to call any of these men and the lack of prejudice to petitioner from their not being called. First, Ronald Williams simply states that on some unrecalled date he saw Mojica, with a gun in his waist band area, run into a restaurant where he said "I just blew his top off" and "this gun is hot". (Resp. Ex. L at ex. A). There is no indication when this occurred and whether it had anything to do with the Williams killing, and in any event it does not at all tend to exculpate petitioner from the felony-murder

---

the cited statements of the witnesses until he filed his leave application in the Appellate Division. Accordingly, respondent says, this aspect of petitioner's argument is not exhausted and can be deemed procedurally barred. Nonetheless, respondent suggests bypassing exhaustion and rejecting this claim on the merits (Resp. Mem. 39-40), and we agree. See 28 U.S.C. § 2254(b)(2).

charge, of which he was convicted.

As for Rafael Garcia, he reports a conversation with another individual who supposedly recounted that he had told the police that he knew nothing concerning "the murder" -- presumably of Williams. According to Garcia, this individual also stated that he had seen Mojica exit the building "first". (Resp. Ex. L at ex. B). Apart from hearsay problems, this account may be intended to place the onus on Mojica for the Williams killing, but in fact it says nothing specific about anyone's role there, and in any event, as noted, it does not tend to exculpate Pequero on the felony-murder charge.

Finally, the statement of Shawn Dunson is the only one in which the speaker purports to have witnessed the shooting of Williams. He states, however, that he initially "lied" about the incident -- although he does not explain to whom or what he had said -- and in his more recent statement he simply asserts that two men entered the premises looking for "Gorilla", that Williams "displayed" a firearm and that one of the others "reacted out of fear and pulled a gun and started shooting at Tyrelle Williams". (Resp. Ex. L at ex. C). This statement appears to be intended to recant one or more prior statements -- presumably to the police --

72

but in any event, apart from using the conclusory term "self-defense", it could not save petitioner's case on the felony-murder charge. First, it is consistent with the proof that petitioner and Mojica entered the building with criminal intent. Second, despite the reference to "fear and "self-defense", it is also at least potentially consistent with the testimony that Pequero or Mojica were the initial aggressors, which would make the justification defense inapplicable. Third, as a recantation long after the fact it is particularly suspect in its obvious effort to revive a justification defense. Fourth, as noted, it appears that a justification defense is not available to defeat a felony-murder charge. See Walker, 78 A.D.3d at 66-71, 908 N.Y.S.2d at 422-25.

In any event, it is entirely plausible that counsel did not choose to call these individuals -- assuming their availability -- because their credibility was suspect and because they added little or nothing to the defense of Pequero. Moreover, that choice was particularly reasonable since the main tactic by counsel for all of the defendants on trial was to emphasize the sleazy nature of the main prosecution witnesses, and to try thereby to undermine their credibility and thus the ability of the State to carry its burden of proof.

Apart from the petitioner's failure to demonstrate that his counsel's trial tactics in this respect amounted to constitutionally deficient representation, he plainly fails as well to demonstrate resultant prejudice. Given the substantial weight of the State's evidence as to not only the Williams killing, but all of the other charges on which Pequero was convicted, the effect of the decision not to call any of these individuals at trial is a matter of pure speculation, with little or no reason to infer that their testimony would have made any difference.

Petitioner also argues that his lawyer should have demanded a missing-witness charge, a "material witness order" and sanctions for destruction of evidence. (Pet. Ex. E ¶ 1(E)). None of these complaints justifies relief.

To justify a missing-witness charge, the defendant must establish that the witness is under the control of the State, that he has information "about a material issue upon which evidence is already in the case", and that "he would naturally be expected to provide noncumulative testimony favorable" to the State. People v. Gonzalez, 68 N.Y.2d 424, 427-28, 509 N.Y.S.2d 796, 798-99 (1986).

The three individuals whom Pequero mentions as candidates for

such an instruction were Calvin Brown, who apparently accompanied Pequero and Mojica to the encounter with Tyrelle Williams; Shawn Dunson, who, as noted, reported being present at the shooting of Williams; and Darryl Query, who was said to have been present at the shooting of Al Cruz. Plaintiff fails, however, to demonstrate that any of these individuals was under the control of the State. He also does not show that they would be expected to provide non-cumulative testimony favorable to the State; indeed, as noted, he takes the position that Dunson's testimony would have been favorable to his own position. In any event, he fails to demonstrate that the court would have granted such an instruction, much less that such a step would likely have made any difference in the outcome of his trial.

As for petitioner's reference to a request for material-witness orders, he fails, for similar reasons, to show that any such request -- even if potentially available -- would have affected the result in his case.

On the question of lost evidence, although a few items were reported as misplaced, the losses of this sort shrink into insignificance in view of the scale of the trial and the vast number of exhibits. One lost item was drugs purchased on one

75

occasion from Tony Council (Tr. 352-58), and the court gave the jury an adverse-inference instruction with respect to that loss. (Tr. 3764-65). The other item of lost narcotics consisted of a rock of crack recovered from one of the co-conspirators -- John Williams -- an apparent oversight that a police witness testified to at trial. (Tr. 216-27). That loss was ultimately irrelevant since Williams's drug possession was not submitted to the jury as an overt act. As for transactions involving Pequero, he makes no assertion that any of the relevant evidence was lost or destroyed. In short, he cannot show any prejudice from misplaced drugs.

Petitioner also refers in his 440.10 motion to a statement by his attorney that could be interpreted as reporting that he had not received certain 911 tapes, which petitioner speculates referred to the Williams and Cruz shootings. (Resp. Ex. I ¶ 38). The record is entirely unclear on this point, and petitioner fails to demonstrate that whatever shortcoming he perceives in counsel's not following up on this issue influenced the result of the trial.

Pequero's last set of complaints about his attorney concerns his failure to move to dismiss the indictment under Crim. Proc. L. §§ 40.20 and 200.60. (Pet. Ex. E). His argument, which appears to be based on his two prior drug convictions, is entirely

76

unpersuasive.

We start with section 200.60, which deals with the circumstance in which a prior conviction will elevate the degree of a pending charge. In that case the prior conviction is not to be alleged in the indictment, but rather by special information, so that the defendant may have the option of conceding that prior record and avoiding any mention of it at trial, rather than solely at sentencing. N.Y. Crim. Proc. L. § 200.60(1)-(3). That circumstance was not presented in this case. Pequero's prior sales were relevant as they constituted predicate acts for the conspiracy charge, and the cited statutory provision does not preclude alleging such predicate acts in an indictment or proving them at trial. Accordingly there was no basis for undertaking the procedures specified in the statute, and hence the decision of the trial lawyer not to press such an obviously meritless argument does not reflect ineffective representation.

The other provision invoked by Pequero is no more helpful to him. Section 40.20(2) bars separate prosecutions "for two offenses based upon the same act or criminal transaction" except in specified circumstances. One of those circumstances -- which tracks the law of double jeopardy -- is when "[e]ach of the offenses as

77

defined contains an element which is not an element of the other, and the statutory provisions defining such offenses are designed to prevent very different kinds of harm or evil". Crim. Proc. L. § 40.20(2)(b).

The only target of petitioner's argument must be the conspiracy charge, which included as overt acts two sales by him for which he had been previously prosecuted. Even so limited, his argument fails.

The precise issue posed here has been addressed in the state courts, and they have interpreted the statute as not having the effect of barring a conspiracy prosecution based on overt acts that themselves have been the subject of earlier prosecution. As the First Department explained in Robinson v. Snyder, 259 A.D.2d 280, 686 N.Y.S.2d 392 (1st Dep't 1999):

> The crime of conspiracy and the category of offenses involving possession of contraband are comprised of distinct elements and serve to prevent different kinds of harm. "The crime of conspiracy is an offense separate from the crime that is the object of the conspiracy." The essence of the offense is an agreement to cause a specific crime to be committed (Penal Law § 105) together with the commission of an overt act by one of the conspirators in furtherance of the conspiracy. . . . But the overt act itself is not the crime in a conspiracy prosecution; it is merely an element of the crime that has as its basis the agreement. Therefore the defendant's conviction arising out

of his possession of illicit drugs is not essential to his
conviction for conspiracy, even though it is an act in
furtherance thereof because conviction may rest 'on the
overt act committed by another.' . . . .

The evil sought to be prevented by the conspiracy
statute is the deterrence of concerted activity in
furtherance of a criminal purpose. . . . [W]here one of the
statutory exceptions is applicable, the double jeopardy
statute does not prohibit successive prosecutions even when
based on the same act or criminal transaction.

Id. at 281-82, 686 N.Y.S.2d at 393-94 (citations omitted). Accord
People v. Wilson, 57 A.D.3d 228, 229, 868 N.Y.S.2d 646, 647 (1st
Dep't 2008); People v. O'Neill, 285 A.D.2d 669, 671, 728 N.Y.S.2d
252, 254 (3d Dep't 2001).


In view of the state appellate courts' interpretation of
section 40.20, petitioner's Sixth Amendment attack on the
performance of his trial attorney is off the mark. The underlying
argument that Pequero asserts that his attorney should have made
was a  loser -- indeed the Wilson decision was rendered on an
appeal by one of Pequero's co-defendants. Hence counsel's failure
to pursue petitioner's theory does not reflect constitutionally
deficient service and certainly did not prejudice him.


In sum, petitioner's Sixth Amendment claim, in all its many
variations, cannot be sustained.

79

CONCLUSION

For the reasons stated, we recommend that the writ be denied and the petition dismissed. We further recommend that a certificate of appealability not issue since petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Ronnie, Room 2203, United States Courthouse, 40 Centre Street, New York, New York 10007, and to the chambers of undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636 (b) (1); Fed. R. Civ. P. 72, 6(a), 6(d)

Dated: New York, New York
       November 23, 2015



                         RESPECTFULLY SUBMITTED,



                         _____
                         MICHAEL H. DOLINGER
                         UNITED STATES MAGISTRATE JUDGE